OPINION OF THE COURT
Kenneth R. Fisher, J.
Defendant is charged with conspiring to kill, and soliciting others to aid in the killing of, Rochester Chief City Court Judge Roy King. The three-count indictment charges conspiracy in the second degree (intent that a class A felony be performed), criminal solicitation in the second degree (intent to engage another person in a class A felony), and criminal possession of a weapon in the fourth degree, arising out of defendant’s alleged purchase of a 9mm Luger caliber Smith and Wesson semiautomatic pistol from two government agents, Rochester Police Investigator Robert Urtis, and an individual working with him, Mohammed Aliuddin. Defendant moves to dismiss or reduce the indictment upon an inspection of the grand jury minutes. Extensive memoranda were submitted by the parties.
A. Count One: Conspiracy in the Second Degree
Defendant contends that the evidence before the grand jury was insufficient to support a conspiracy charge because, despite defendant’s own professed intentions, made to Aliuddin and undercover Officer Urtis, the latter individuals never subjectively agreed or otherwise objectively manifested to defendant an assent to defendant’s intention that a class A felony, murder, be performed. Defendant relies on recorded statements of Aliuddin, who discouraged defendant from committing a murder, and of Urtis, who said to the defendant at the time the gun was delivered that what he did with the gun was his own business. Defendant reasons that the statute requires an agreement between two or more individuals to commit a crime, and that without some manifestation of assent to defendant’s plan, feigned or otherwise, there was “no illicit agreement” (People v Berkowitz, 50 NY2d 333, 343 [1980]) to commit a class A felony, but rather only an agreement to purchase a gun.[1]
Defendant relies on the cases of United States v Falcone (109 F2d 579 [2d Cir 1940], affd 311 US 205 [1940]) and Direct *682 Sales Co. v United States (319 US 703 [1943]). These cases are applications of the familiar principle, restated in the subsequent case of Ingram v United States (360 US 672 [1959]), that liability under the general federal conspiracy statute for a “[conspiracy to commit a particular offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself.” (Id. at 678, quoting Note, Developments in the Law — Criminal Conspiracy, 72 Harv L Rev 922, 939 [1959]; see People v Ozarowski, 38 NY2d 481, 489-490 [1976].) In Falcone, a supplier of goods otherwise in free commerce, i.e., sugar, yeast and cans, was held not guilty of conspiring with a group of distillers to operate an illegal bootlegging operation because the suppliers had only a diffuse knowledge that the goods would be used in the illegal fashion actually contemplated by the buyer, and the supplier did not have knowledge that the buyer was conspiring with other distillers in a broader illicit distillery operation. In Direct Sales, by contrast, a supplier of morphine sulphate was held to have joined an illegal drug distribution conspiracy engaged in by the doctor/buyer because the supplier sold a highly regulated product not in “free commerce” (id., 319 US at 710-711) “in such quantities, so frequently and over so long a period [the supplier] must have known [the doctor/buyer] could not dispense the amounts received in lawful practice and was therefore distributing the drug illegally.” (Id. at 705.) The defendant supplier in Direct Sales was held “not only [to] kno[w] and aquiesc[e], but [to] joi[n] both mind and hand with [the doctor/ buyer] to make its accomplishment possible.” (Id. at 713 [adding that “(t)he step from knowledge to intent and agreement may be taken” (emphasis supplied)].)
A case more closely aligned on the facts is United States v Gallishaw (428 F2d 760 [2d Cir 1970]), in which a conspiracy conviction was reversed because the jury was charged that defendant could be convicted of conspiracy to rob a bank if he rented or sold a gun to the ultimate bank robber upon proof that defendant only knew that the ultimate robber was up to some unspecified criminality and that he intended to use the gun in connection therewith. The court held that the prosecution was bound to show “at the very least” that defendant “knew that a bank was to be robbed.” (Id. at 763.) For the reasons stated below, Direct Sales supports the People’s position, and the Falcone and Gallishaw cases are distinguishable on their facts from this case, in which Aliuddin and Urtis clearly knew of defendant’s murderous plan. But there is a *683 more fundamental flaw in defendant’s argument, which briefly acknowledges, but fails to appreciate, that New York has adopted the unilateral theory of conspiracy (People v Schwimmer, 47 NY2d 1004 [1979], affg for reasons stated at 66 AD2d 91 [2d Dept 1978]; Penal Law § 105.30), and has eschewed the bilateral model under the federal general conspiracy statute (18 USC § 371).
Defendant’s argument focuses on Urtis’ role and that of Aliuddin, instead of viewing the situation from defendant’s peculiar vantage point, his specific intent, and his knowledge. The Falcone, Direct Sales, and Gallishaw cases involve defendants who are in Urtis’ or Aliuddin’s position vis-a-vis the ultimate criminal enterprise. The question common to each of them is whether a supplier or seller of goods, such as a gun or regulated drug (Direct Sales and Gallishaw), or sugar and yeast (Falcone), can be convicted of conspiracy with the buyer even if the seller only had some vague knowledge of the buyer’s conspiracy with others (Falcone) or of the buyer’s own illegal plans for the product (Direct Sales and Gallishaw). The rule is the same for both situations. (Direct Sales, 319 US at 711 n 7 [“Although this principle was (in Falcone) applied to aiding and abetting a conspiracy among others, it has at least equal force in a situation where the charge is conspiring with another to further his unlawful conduct, without reference to any conspiracy between him and third persons”].)
Here, by contrast, the seller or supplier, Aliuddin and Urtis, had concrete knowledge of defendant’s alleged murderous plan, and in any event the defendant was the alleged instigator (at least if the allegations accepted by the grand jury are to be believed). On the morning before defendant purchased the gun from Urtis, he told Aliuddin that “he wants to kill Judge King” because “[h]e is angry on him because he did not hear his case * * * [and] throwed the case out of court.” Defendant said “that is why he wanted to buy a gun” and inquired of Aliuddin where he might purchase a gun. Defendant also listed as targets his tenants and two unnamed lawyers. Defendant requested an “automatic or semi-automatic” gun with “about fourteen or fifteen bullets in it.” Defendant wanted to obtain the gun “as soon as possible.” Thus, unlike the situation in Falcone and Gallishaw, the suppliers in this case, Urtis and Aliuddin, had full knowledge of defendant’s murderous plan, and defendant knew that they had such knowledge because he personally informed them of it.
According to Aliuddin, he told defendant to “cool off’ and that it was “not a good thing to kill somebody.” But defendant *684 replied, “No, I am not — I want to kill the Judge and I need the gun.” Aliuddin testified that he then said, “Okay, I will go and talk to the people and then I will get back to you in a half-hour or forty-five minutes,” if a gun could be found that day. Otherwise it would be Monday. Defendant insisted, “As soon as possible is better.” Aliuddin indicated that his source would be patrons of gun auctions. The two exchanged telephone numbers. The gun was supplied that afternoon. Urtis testified that defendant also told him of his plans for the gun and that he needed bullets right away. Asked in the grand jury whether defendant explained why he wanted the gun, Urtis testified that defendant said, “I’m fighting with a Judge.” As set forth below, Aliuddin’s agreement to locate a gun, despite his brief protestation against defendant’s alleged murderous plan, Urtis’ conduct in supplying the gun with knowledge of defendant’s plan, would be, if it was necessary, sufficient circumstantial evidence of ostensible intent on their part to send the case to the jury.
Given the unilateral approach to conspiracies in this state, however (see People v Berkowitz, 50 NY2d at 342-343; People v Schwimmer, supra; Penal Law § 105.30), the focus is on the defendant’s state of mind when he bought the gun, not on Urtis’ or Aliuddin’s state of mind when they agreed to procure and later sold the gun to defendant. Therefore, the Falcone, Direct Sales, and Gallishaw cases have no real application to a unilateral conspiracy statute. The question is whether there was an “illicit agreement” (People v Berkowitz, 50 NY2d at 343),[2] and the fact that Urtis and Aliuddin were only facilitating defendant’s intended criminal enterprise by supplying him with a gun does not reduce defendant’s liability if he, the defendant, from his prospective, intended the commission of murder and thought that he was agreeing with Aliuddin and Urtis (by reference to their words or conduct) to commit the crime of murder.[3] Irrelevant under New York law are such factors as “[t]he identity and degree of participation by the other persons,” i.e., Urtis and Aliuddin, and “the niceties of contract *685 law concerning when an agreement is consummated (e.g., meeting of the minds).” (People v Schwimmer, 66 AD2d at 95.) “If an individual believes he has so joined, it is sufficient to establish complicity, regardless of the actual fact of agreement.” (Id. at 95-96.) Furthermore, “if an individual may himself accomplish the criminal objective [as assuredly defendant could once in possession of the gun], the mere belief that combination has occurred is sufficient * * * [and] [t]his is particularly so in the instant situation where, barring the serious problems of entrapment, it appears that the individual defendant is the originator of the criminal plan and the one most anxious to see the successful completion of the criminal objective.” (Id. at 96; see 2 CJI[NY] art 105, at 11E [1st ed 1981].)
The statute confirms this view, because under its express terms defendant would not be relieved of responsibility for what he, himself, agreed to, and intended, by reason of Urtis’ and Aliuddin’s “unawareness of * * * the object conduct, or of the defendant’s criminal purpose.” (Id., 66 AD2d at 98, quoting Penal Law § 105.30.) Thus, if it is no defense that a defendant lacked knowledge of coconspirator’s true intentions (regarding the proposed murder of a judge), a fortiori it is no defense that Urtis and Aliuddin, who knew of defendant’s criminal purpose, discouraged the defendant from murder or distanced themselves in words from defendant’s ultimate objective while ostensibly joining defendant’s murderous plan by supplying the desired gun. (See also, Model Penal Code § 5.03, Comment, at 400 [1985] [“He has conspired, within the meaning of the definition, in the belief that the other party was with him; apart from the issue of entrapment often presented in such cases, his culpability is not decreased by the other’s secret intention”].)
Finally, this analysis accords with the treatment of the issue in 2 Wayne R. LaFave and Austin W. Scott, Jr., Substantive Criminal Law (§ 6.4 [e] [6] [1986] [“Plurality of Intent”]). Observing that, under the bilateral approach, “it must be shown that the requisite intent existed as to at least two persons” (id.), the authors point out the criticism in the literature of this view (id., citing Note, Developments in the Law — Criminal Conspiracy, 72 Harv L Rev 922, 940 [1959] [“if wrongful intent is required, it should be enough that one person alone possesses it”]), and they conclude that “under the unilateral approach of the Model Penal Code the one party to the agreement with the necessary mental state could be convicted.” (Id.) Accordingly, there was sufficient evidence before the grand jury to support the conspiracy charge.
*686 Although the above discussion is enough to dispose of defendant’s argument, it is useful to examine his claim on its own terms. Even under a bilateral approach to conspiracy, putting aside for the moment that there cannot be a bilateral conspiracy with a government agent,[4] and focusing on the outward manifestations to defendant by Aliuddin and Urtis of agreement, the line of cases cited by defendant are of no help to him. As the above recitation of facts shows, both Aliuddin and Urtis had more than only a “generalized suspicion of [the] illegal use” to which the gun would be put. (United States v Rosenblatt, 554 F2d 36, 39 [2d Cir 1977].) As stated in Gallishaw (428 F2d at 763) and explained in Rosenblatt (554 F2d at 38-39), liability for conspiracy on the part of a supplier of a gun may be shown if the government “at the very least” shows that the suppliers (here Aliuddin and Urtis) “knew that a bank was to be robbed” (taking the facts of Gallishaw). Here, Aliuddin and Urtis knew of defendant’s murderous plan; they did not merely supply a gun with knowledge “that there was a conspiracy to do something wrong and to use the gun [in some unspecified way] to violate the law” (Gallishaw, 428 F2d at 762 [quoted in Rosenblatt, 554 F2d at 38-39]). The very clear knowledge of the murderous plan given to Aliuddin and Urtis by defendant certainly raises an issue of fact whether, despite their verbal efforts to distance themselves from defendant’s plan, their agreement to procure the gun, and their eventual sale of the gun to defendant with such specific and dramatic knowledge of what defendant intended to do with it, manifested an agreement to defendant’s ultimate plan. Unquestionably, the actions of Aliuddin and Urtis in agreeing to procure, and in fact supplying, the gun to defendant, “were committed in furtherance of’ defendant’s plan and with full knowledge of it. As explained in United States v Gleason, “ ‘a person may be held to intend that which is the anticipated consequence of a particular action to which he agrees, when that action is unreasonable in view of that consequence.’ ” (Id., 616 F2d at 16-17 [2d Cir 1979], quoting Note, Developments in the Law — Criminal Conspiracy, 72 Harv L Rev 922, 932 [1959].)
*687 With proof that Aliuddin and Urtis knew “of the essential nature of the conspiratorial plan” (Rosenblatt, 554 F2d at 39), there is enough to send the conspiracy case to a trial jury on the theory that the supply to defendant of such a dangerous and integral part of his murderous plan is, prima facie, circumstantial evidence of their agreement to the plan. (Gallishaw, 428 F2d at 763.) As in Direct Sales, “[t]he step from knowledge to intent and agreement may be taken” (id., 319 US at 713). Supplying a gun in such circumstances is more than merely aiding and abetting a conspiracy, which is a separate crime not charged in this indictment. (Direct Sales, 319 US at 709 [“one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy”]; United States v Ortega, 44 F3d 505, 506 [7th Cir 1995, Posner, Ch. J.] [“while a conspirator is almost always also an aider and abettor, an aider and abettor is often not a conspirator” (citations omitted)].)
Defendant’s argument also ignores the well-settled rule in conspiracy prosecutions that, “so long as the purpose of the agreement is to facilitate commission of a crime, the actor need not agree ‘to commit’ the crime.” (Model Penal Code § 5.03 [1] [a], Comment, at 421 [quoted in Salinas v United States, 522 US 52, 65 (1997) (adding that “[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor * * * [which may occur] in any number of ways short of agreeing to undertake all of the acts necessary for the crime’s completion”)]; see also, H. Wechsler, W.K. Jones, and H.L. Korn, The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation, and Conspiracy, 61 Colum L Rev 957, 978-979 [1961].) In other words, having the criminal intent necessary for the commission of the object crime, which is all on the state of mind issue Ingram requires, is not the same as agreeing to commit all the other elements of that crime, which is not required. Accordingly, defendant’s argument, drawn from Falcone and Direct Sales, is unavailing even if taken on its own terms. Given that the government agent issue is no impediment to conviction, the proof of agreement on the part of Aliuddin and Urtis, that is the proof of plurality of intent, is sufficient to sustain the indictment even on a bilateral theory of conspiracy. For the reasons stated above, however, the argument wholly misses the proper focus on defendant’s state of mind under a unilateral conspiracy statute such as we have in New York.
*688 B. Criminal Solicitation in the Second Degree
Defendant moves to dismiss count two on the ground (as limited by his moving papers) that he never asked anyone else to commit a murder, and that the evidence before the grand jury only showed defendant’s intention to use the gun alone, exclusively for his own benefit. He points out that the $350 he used to pay for the gun was “certainly not enough to buy their [i.e., Aluiddin’s and Urtis’] intentional involvement in a capital murder,” and that there was no other evidence that he intended to involve others in his plan. Defendant contends that, “at best,” the evidence showed criminal solicitation in the fifth degree (Penal Law § 100.00), specifically, that he solicited Aluiddin and Urtis to commit criminal facilitation in the second degree (Penal Law § 115.05; People v Letizia, 122 AD2d 555 [4th Dept 1986]). The People respond that, by virtue of the evidence that defendant made his murderous plan fully known to Aliuddin and Urtis, and his insistence on procurement of the gun and bullets “as soon as possible,” defendant clearly solicited the two government agents to aid and abet a murder by supplying him with a gun.
The statutory formulation of criminal solicitation in New York generally proscribes solicitation of “conduct constituting a crime” (Penal Law § 100.00), in this case “conduct constituting a class A felony.” (Penal Law -§ 100.10.) That definition would clearly reach a solicitation “to aid and abet the commission of a crime.” (2 Wayne R. LaFave and Austin W. Scott, Jr., Substantive Criminal Law § 6.1 [c] [1986]; see also, Model Penal Code § 5.02, Comment, at 375 [1985] [“if the party solicited is asked to render such aid as would make him a party to the contemplated substantive crime * * * , the solicitation itself is criminal”]; Moss v State, 888 P2d 509, 517 [Ct Crim App, Okla 1994] [solicitation of another to find a “hit man”]; People v Quiroz, 253 Ill App 3d 739, 745, 625 NE2d 856, 861 [1993] [“irrelevant that Brown was not directly requested to perform the murder” — enough that “he was requested to look into’ getting Adams to do so”]; State v Yee, 160 Wis 2d 15, 17-18, 465 NW2d 260, 261 [1990] [same] [collecting authorities, including People v Bloom, 149 App Div 295 (2d Dept 1912) (same)].)
Given the abundant proof before the grand jury that defendant fully informed Aliuddin and Urtis of his murderous design, and in particular of his specific desire to use the gun and bullets as the murder weapon, defendant’s request of both individuals was, in essence, a request that they engage in conduct that would make them an accessory to murder. In par *689 ticular, the conduct solicited, supplying gun and bullets with full knowledge of defendant’s murderous plan, was sufficient in law to make them, but for their feigned state of mind (see Penal Law § 100.15), liable as an accessory to murder. (Penal Law § 20.00; People v Pla, 210 AD2d 77 [1st Dept 1994] [supplying baking powder used to convert cocaine to crack with full knowledge of its intended use by the crack cocaine seller]; 2 Wayne R. LaFave and Austin W. Scott, Jr., Substantive Criminal Law § 6.7 [a] [1986] [“accomplice may furnish gun”]; cf., People v Beaudet, 32 NY2d 371, 377 [1973] [“knowing aid in providing the means to commit the robbery”].)
As Chief Judge Posner puts it, “aiding and abetting requires knowledge of the illegal activity that is being aided and abetted, a desire to help the activity succeed, and some act of helping.” (United States v Zafiro, 945 F2d 881, 887 [7th Cir 1991], affd on other grounds 506 US 534 [1993] [paraphrasing L. Hand, J., in the classic formulation of the definition in United States v Peoni, 100 F2d 401, 402 (2d Cir 1938)]; see People v Morhouse, 21 NY2d 66, 73 [1967]; People v Letizia, 122 AD2d 555 [4th Dept 1986]; People v Lilli, 71 AD2d 393, 401 [4th Dept 1979].) A store clerk’s sale of a “dress to a prostitute knowing that she will be using it in plying her trade is not guilty of aiding and abetting,” because the dress sale is “too trivial to support an inference that the clerk actually wants to help the prostitute succeed in her illegal activity.” (Id., 945 F2d at 887 [observing, “(t)hat is where the requirement of proving the defendant’s desire to make the illegal activity succeed cuts off liability,” i.e., as an accessory].) The case of People v Letizia (supra), relied on by defendant, is an example. But if the putative aiders and abettors, here Aliuddin and Urtis, “knowingly providfe] essential assistance [here by procuring and supplying a gun to one with an announced murderous intent], we can infer that [t]he[y] d[o] want [h]im to succeed, for that is the natural consequence of * * * [their] deliberate act.” (Id., 945 F2d at 887-888 [adding that it is “better in evaluating charges of aiding and abetting to jettison talk of desire and focus on the real concern, which is the relative dangerousness of different types of assistance”].) That Aliuddin and Urtis did not actually intend a murder is of no consequence if defendant requested that they commit conduct which would, if they so intended, make them aiders and abettors of murder. (People v Lubow, 29 NY2d 58, 64 [1971] [“fortuity that the person solicited does not agree to commit or attempt to commit the incited crime plainly should not relieve the solicitor of *690 liability”].) Knowledge of defendant’s murderous plan on Aliuddin’s and Urtis’ part is what distinguishes solicitation from facilitation. (People v Kaplan, 76 NY2d 140, 146 [1990].) Accordingly, defendant’s motion to dismiss or reduce count two is denied.[5]
Conclusion
The motion to dismiss or reduce is denied.

. The recorded statements defendant relies on were not introduced into evidence at the grand jury. Aliuddin’s grand jury testimony, however, described below, contains a similar account of his attempt to dissuade defendant. Urtis’ testimony in the grand jury is silent on the subject.

. “Proof of conspiracy requires evidence that defendant entered into an agreement, either express or implied, to commit a crime.” (People v Givens, 181 AD2d 1031, 1031 [4th Dept 1992].) “The fact of agreement may be established inferentially by circumstances indicating that defendant engaged in a common effort or acted in concert with others to achieve a common goal.” (Id.)

. “The fact of agreement serves only to unequivocally establish a particular actor’s intent to commit the object crime by acting with others.” (People v Schwimmer, 66 AD2d at 95 [emphasis supplied].)

. Defendant concedes that this is a unilateral conspiracy state and thus implicitly agrees that the government agent status of Aliuddin and Urtis provides no impediment to conviction. When considering defendant’s claim on its own terms, however, the court must consider what evidence of agreement on the other party’s part is sufficient to establish an agreement with defendant. It is on this discrete aspect of bilateral conspiracy law, the rule of plurality of intent, that the current discussion addresses.

. Defendant’s moving papers do not raise the statutory exemption issue. (Penal Law § 100.20; People v Allen, 92 NY2d 378, 383 [1998] [“(u)pon examination of the conduct engaged in by these defendants, it is clear that a [crime] could not have occurred but for their direct participation”].) The parties are directed to brief this issue prior to trial. (Id. at 382 [“the statute requires that a court search beyond the four corners of the accusatory instrument and decide whether or not the charged conduct falls within the reach of the exemption language”].)